## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## DAVENPORT DIVISION

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | Civil Action No. 09 CV 00095 |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | The Honorable Charles R. Wolle |
| | ) | |
| v. | ) | Magistrate Judge Celeste F. Bremer |
| | ) | |
| BUSH HOG, LLC and GREAT PLAINS | ) | |
| MANUFACTURING INCORPORATED, | ) | **DECLARATION OF DR. RICHARD L. PARISH** |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |
| | ) | |

## DECLARATION OF DR. RICHARD L. PARISH

I, DR. RICHARD L. PARISH, hereby declare under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1.     I have been asked to provide my opinion as to how a person of ordinary skill in the art would understand a number of terms from United States Patent Number 6,052,980 ("the '980 patent"). My qualifications are set forth below and may also be found in my curriculum vitae. (Appendix A).

2.     I have over 40 years of experience in the agricultural equipment industry.

3.     I have a Bachelor of Science, a Master of Science and a PhD in Agricultural Engineering from the University of Missouri. From 1969 through 1974, I was an assistant then associate professor in the Agricultural Engineering Department at the University of Arkansas.

4.      From 1974 through 1983, I was a manager of the Mechanical Research and Development Department of a lawn products company called O.M. Scott and Sons Company. During my time with O.M. Scott and Sons, I was awarded two patents in the agricultural industry.

5.     In 1984, I once again became an associate professor and then a professor in 1988, this time in the Agricultural Engineering Department of Louisiana State University, where I stayed until 2008. During this time, I taught various undergraduate and graduate agricultural engineering courses including: Agricultural Machine Design and Farm Equipment Dealership Management and Farm Machinery. I am currently a professor emeritus with Louisiana State University.

6.     Throughout the course of my career, I have designed and managed the design of a large number of agricultural machines, including: modified flail mowers, rotary spreaders, cotton strippers, and planters.

7.     I have published more than 100 refereed journal articles and several hundred other articles on various agricultural engineering topics, including rotary cutters. I have been a consulting editor of the Journal of Vegetable Crop Production since 1992 and was an associate editor of the Transactions of ASAE and Applied Engineering in Agriculture from 1998-2003.

8.     I have also been involved in various engineering and agricultural societies including: the American Society of Agricultural and Biological Engineers (ASABE), the American Society for Horticultural Science (ASHS) and the Society of Automotive Engineers (SAE). Through my involvement in ASABE, I have worked on the development of machinery standards and I have also participated in the ASABE committee that deals with approval of all safety-related standards.

9.     In preparation for this Declaration, I have relied on my agricultural industry experience and studied the following items:

A.     United States Patent Number 6, 052,980 (Appendix B);

B.     The '980 prosecution file and references cited therein (Appendix C);

C.    The parties' infringement and non-infringement contentions;

D.    The parties' validity and invalidity contentions; and

E.    The parties' joint claim construction statement (Appendix D).

I.    A Person of Ordinary Skill in the Art

10.    It is my opinion that a person of ordinary skill in the art of the '980 patent would be a person with a Bachelor of Science degree in agricultural or mechanical engineering and at least one to two years of practical engineering design experience involving rotary cutters or similar agricultural equipment. A person of ordinary skill in the art of the '980 patent would have an understanding of basic principles of rotary cutters in the 1996 to 2000 time frame when the inventor of the invention claimed in the patent-in-suit conceived his invention and reduced it to practice.

11.    With over forty years of experience in the agricultural engineering field, I am well acquainted with the level of ordinary skill required to design rotary cutters and other agricultural machinery.  I have direct experience with engineering design and with rotary cutters, and am capable of rendering an informed opinion on what the level of ordinary skill in the art was for such engineers in 1996-2000.

II.    Opinions Regarding Claim Construction

12.    I have considered the disputed terms in the '980 patent.  I am not a patent attorney.  I have, however, gained experience in the processing of my own patents, in serving as an expert witness in patent litigations, and in teaching seminars that include legal aspects of agricultural engineering.  The opinions expressed here are those of a person of ordinary skill in the art.

13.    It is my understanding that the primary sources for understanding the claims of a patent, or defining the words in a claim, are: (1) the language of the claim, (2) the patent's specification, and (3) the prosecution history of the patent.  Finally, extrinsic evidence such as dictionary definitions, treatises and prior art may also be considered.

14.    I also understand that the preamble of a claim can be an element of the claim if it provides necessary structure for the rest of the claim.

III.    The Disputed Claim Terms

15.    The parties' July 1, 2010 joint claim construction statement sets forth the disputed claim terms of the '980 patent and each parties' proposed construction.  (Appendix D).  I agree with the claim interpretations proposed by Deere.  In my opinion, each of the proposed constructions is consistent with the ordinary meaning of the terms and consistent with the meaning of the terms as used in the '980 patent.  The following contains my further opinions and bases therefore regarding the disputed claim terms.

A.    "Rotary Cutter Deck"

16.    The term "rotary cutter deck" is used in the preamble of claims 1, 3 and 6, which Deere has asserted against Bush Hog and Great Plains. (Appendix B, '980 Patent).  This was the inventor's way of providing structure and context for the rest of the claim. Without the term "rotary cutter deck," the elements that follow are meaningless and a person of ordinary skill in the art would not know the scope of the claims.

17.    The abundance of rotary cutter references throughout the '980 specification makes clear the scope of the patent. In one instance, the '980 specification states "The present invention relates to rotary cutters and more specifically relates to decks for such cutters."

(Appendix B, '980 Patent, 1:19-20). In a second instance, the '980 specification declares that "According to the present invention, there is provided an improved deck for a rotary cutter." (Appendix B, '980 Patent, 1:38-39).

18.     I interpret the term "rotary cutter deck" to mean "a body of a mower having a cutting blade rotating on a vertical axis that is pulled behind, or partially mounted to, and powered by a tractor or similar type vehicle." In my opinion, this would exclude equipment such as consumer turf care equipment, self-powered mowers, self-propelled mowers or walk-behind mowers.

19.     I believe one authoritative source for understanding how a person of ordinary skill in the art would interpret the term "rotary cutter" is the standards that apply to this industry. As mentioned above, I have been involved in the ASABE standards development and approval process and believe them to be reliable and respected by those in the industry.

20.     ASABE's Agricultural Rotary Mower Safety standard, ASAE S474, defines its scope as applying to "towed, semi-mounted, and mounted mowers . . . intended for marketing as agricultural rotary mowing equipment and designed for cutting and/or shredding grass and other growth and crop residue . . . while powered by an agricultural tractor." (Appendix E). S474 also defines the term "rotary mower" as "A power mower in which one or more functional components cut or shear by impact and rotate about an axis perpendicular to the cutting plane." (Appendix E). This standard also states that "turf care equipment primarily designed for personal use, consumption, or enjoyment by a consumer in or around a permanent or temporary household or residence" and "Self-powered or self-propelled mowers" are excluded. (Appendix E).

21.     I also find the ISO standards published by the International Organization for Standardization helpful. ISO 17101:2004(E) sets out the parameters for conducting the thrown

object test on rotary cutters. (Appendix F). This standard similarly defines a "rotary mower" as a "mower in which one or more functional components cut or shear by impact without mulching and rotate about a vertical axis." (Appendix F). ISO 17101:2004(E) also excludes equipment such as "pedestrian-controlled motor mowers" and "lawn mowers or machines designed as lawn mowers." (Appendix F).

22.     I think it is revealing that the products offered by each party under the category of "rotary cutters" are all "a mower having a cutting blade rotating on a vertical axis that is pulled behind, or partially mounted to, and powered by a tractor or similar type vehicle." (Appendix G Deere Heavy-Duty Rotary Cutter Brochure; Appendix H, Deere Standard-Duty Rotary Cutter Brochure; Appendix I, Great Plains' Rotary Cutter Brochure; Appendix J, Bush Hog's Rotary Cutter Webpage). None of the products are consumer turf care equipment, self-powered mowers, self-propelled mowers or walk-behind mowers. (Appendices G-J).

23.     From my review of the '980 patent and its prosecution history (Appendices B, C) the above meaning of "rotary cutter" is used in the '980 patent.

B.     "Deck Wall"

24.     The term "deck wall" is used in claims 1, 3 and 6. (Appendix B, '980 Patent). I interpret the term "deck wall" as used in the '980 patent to have its normal meaning which is "a structural surface extending over the blade area which is capable of supporting other parts of the cutter exerting high forces and capable of withstanding high impact."

25.     The '980 specification supports this definition. Claim 1 of the '980 patent requires the upper and lower deck walls and right- and left-hand end wall structures to define a box section having torsional stiffness. (Appendix B). The specification states that the strength of the

deck can be increased by increasing the thickness of the deck walls. (Appendix B, Col. 4, ll. 32-38).

26.     The '980 specification also discloses specific components that depend from and are supported by the deck walls. For example, the specification discloses welding baffles to the lower and upper deck walls. (Appendix B, Col. 3, ll. 53-58). The specification also provides that the lower and upper deck walls must support gear boxes that are capable of exerting high forces. (Appendix B, Col. 2, ll. 34-43, 46-53). These configurations are common among rotary cutters as is seen by the parties' rotary cutters. (Appendices G-J).

27.     From my review of the '980 patent and prosecution history (Appendices B, C), the above meaning of "deck wall" is used in the '980 patent.

C.     "A Lower Substantially Planar, Horizontal Deck Wall"

28.     The phrase "a lower substantially planar, horizontal deck wall" is used in claim 1. (Appendix B, '980 Patent). I interpret this phrase to mean a deck wall, as defined above, that is "largely, but not necessarily wholly, in a single plane" and horizontal. It is my understanding that none of the parties dispute the meaning of the term horizontal and therefore, its normal meaning prevails.

29.     The Merriam-Webster's Tenth Collegiate Dictionary defines "substantial" as "being largely but not wholly that which is specified." (Appendix K, p. 1174).

30.     Another definition of "substantial" is "Considerable in importance, value, degree, amount or extent." (Appendix L, The American Heritage Dictionary of the English Language (Fourth Edition, 2000), p. 1727).

31.     These dictionaries also define "planar" as "of, relating to, or lying in a plane." (Appendix K, p. 889; Appendix L, The American Heritage Dictionary of the English Language (Fourth Edition, 2000), p. 1341).

32.     The '980 specification also supports this meaning. The lower deck wall is described in the '980 specification as "being horizontal and having an underside free of structural members, except for the usual material flow baffles, allowing for smooth material flow." (Appendix B, Col. 1, ll. 51-53). The specification also notes that gear box supports 36, 38, and 40 are welded to the lower deck wall section (Appendix B, Col. 2, ll. 34-39). Figure 3 of the patent makes clear that the flanges of these supports are welded to the underside of the lower deck wall section, thus preventing the lower deck wall surface from being absolutely planar. Furthermore, tabs 101 of the support plates 98 and 100 are welded to slots in the lower deck wall (Appendix B, Col. 3, ll. 27-30). Again, Figure 3 of the patent makes clear that these tabs are welded to the underside of the lower deck wall, thus preventing the lower deck wall from being absolutely planar. Therefore, the specification confirms that the lower deck wall does not have to be entirely in a single plane.

33.     From my review of the '980 patent and prosecution history (Appendices B, C), the above meaning of "substantially planar" is used in the '980 patent.

                    D.     "Into Engagement With And Being Secured To"

34.     The phrase "into engagement with and being secured to" is used in claim 1. (Appendix B, '980 Patent). I interpret this phrase to mean a "brought together, directly or indirectly through intermediate structure, and held fast." I do not believe this requires actual contact.

35.     The Merriam-Webster's Tenth Collegiate Dictionary defines "engagement" as "the act of engaging : the state of being engaged." (Appendix K, p. 383). The definition offered of "engage" is "to come together and interlock." (Appendix K, p. 383).

36.     The Merriam-Webster's Tenth Collegiate Dictionary defines "secure" as "to take (a person) into custody : hold fast PINION b: to make fast." (Appendix K, p. 1056).

37.     Another definition of "secure" is "To make firm or tight; fasten." (Appendix L, The American Heritage Dictionary of the English Language (Fourth Edition, 2000), p. 1574-75).

38.     The '980 specification also supports this meaning as it describes the upper and lower deck walls being brought together and held fast both directly to one another in one example and also indirectly with a filler plate being sandwiched between the upper and lower deck wall in a second example. (Appendix B, Col. 2, l. 67 – Col. 3, l. 7.). Therefore, the specification confirms that the lower and upper deck walls do not have to touch.

39.     From my review of the '980 patent and prosecution history file (Appendices B, C), the above meaning of "into engagement with and being secured to" is used in the '980 patent.

> E.     "Joined"

40.     The American Heritage Dictionary of the English Language (Fourth Edition, 2000) defines "join" as "v. intr. To come together so as to form a connection: where the two bones join." (Appendix L, p. 943).

41.     From my review of the '980 patent and prosecution history file (Appendices B, C), the ordinary meaning of term "joined" is used in the '980 patent.

> F.     "Box Section"

42.    From my review of the '980 specification and prosecution history file (Appendices B, C), the ordinary meaning of "box section" is used in the '980 patent.

G.    "Having Torsional Stiffness"

43.    The phrase "having torsional stiffness" is used in claim 1. (Appendices B, '980 Patent). I interpret this phrase to mean "providing high resistance to twisting."

44.    The Merriam-Webster's Tenth Collegiate Dictionary defines "torsion" as "the twisting or wrenching of a body by the exertion of forces tending to turn one end or part about a longitudinal axis while the other is held fast or turned in the opposite direction; *also* : the state of being twisted." (Appendix K, p. 1245).

45.    Another definition of "torsion" is "1.a. The act of twisting or turning. b. The condition of being twisted or turned. 2. The stress or deformation caused when one end of an object is twisted in one direction and the other end is held motionless or twisted in the opposite direction." (Appendix L, The American Heritage Dictionary of the English Language (Fourth Edition, 2000), p. 1823).

46.    The Fourth Edition of the Dictionary of Mechanical Engineering also similarly defines "torsion" as "The application of a twist without any bending, producing a pure torque." (Appendix M, p. 403).

47.    The Merriam-Webster's Tenth Collegiate Dictionary (Appendix) defines "stiff" as "1a: not easily bent : RIGID . . . 2a: FIRM, RESOLUTE b: STUBBORN, UNYIELDING." (Appendix K, p. 1155).

48.     Another definition of "stiff" is "1.a. Difficult to bend; rigid. 2.a. Not moving or operating easily or freely; resistant: *a stiff hinge*." (Appendix L, The American Heritage Dictionary of the English Language (Fourth Edition, 2000), p. 1702).

49.     From my review of the '980 specification and prosecution history file (Appendices B, C), the above meaning of "having torsional stiffness" is used in the '980 patent.

        H.     "Cross Tube"

50.     The term "cross tube" is used in claim 3, which Deere has only asserted against Bush Hog. (Appendices B; D, Joint Claim Construction Statement). I interpret this term to mean "a hollow elongated structural element." I do not believe any particular shape of structural element is required.

51.     Both the Steel Construction Manual (Sixth Edition, 1965) and the Design Manual for Structural Tubing (1974), which are issued by the American Iron and Steel Institute (AISI), identify various shapes of tubing, including round, square, and rectangular. (Appendices N and O). Therefore, I do not believe any one shape is required.

52.     The '980 specification also supports this meaning. The cross tubes are used as part of the stiffening framework of the rotary cutter deck. (Appendix B, Col. 2, ll. 15-16). Many other components are welded to and depend from the cross tubes, such as: stringers, deck walls, aprons, support plates and baffles. (Appendix B, Col. 2, ll. 18-26, 32-34, 59-66, Col. 3, ll. 8-12, 16-24, 34-37, Col. 3, l. 65-Col. 4, l. 27).

53.     Figures 1 and 2 of the '980 patent also illustrate the cross tubes as running from one end of the deck to the other; therefore being elongated. (Appendix B). Figure 3 of the '980 patent discloses square cross tubes. (Appendix B).

54. From my review of the '980 patent and prosecution history file (Appendices B, C) the above meaning of "cross tube" is used in the '980 patent.

I. "Substantially Obstruction Free From Front to Back"

55. The phrase "substantially obstruction free from front to back" is used in claim 6. (Appendix B, '980 Patent). I interpret this phrase to mean "largely, but not necessarily wholly, free from transverse obstructions."

56. As described above, the normal meaning of "substantially" is "largely, but not necessarily wholly." *See* ¶¶ 28-29 above.

57. The '980 specification supports this meaning. It is my understanding that the general idea of the '980 patent is to provide a rotary cutter deck that allows debris and water to run off the front and back of the rotary cutter deck, but not the sides. (Appendix B, Col. 1, ll. 43-47). The upper deck wall accomplishes this by having a central portion from which front and rear sections slope downwardly and forwardly and downwardly and rearwardly. (Appendix B, Col. 4, ll. 45-49). The '980 patent does allow structures, which run from front to back, on its upper deck wall, such as hitch supports, stringers, and support plates. (Appendix B, Col. 2, ll. 12-26, Col. 3, ll.39-52, Col. 3, ll. 16-27, Fig. 1). The '980 patent does not allow structures to run from side to side, transversely, across the upper deck wall as this would prevent debris and water from running off the front and back of the rotary cutter deck.

58. From my review of the '980 patent and prosecution file (Appendices B, C) the above meaning of "substantially obstruction free from front to back" is used in the '980 patent.

J. "Easily"

59. The term "easily" is used in claim 6 – "whereby material may slide or be easily

washed off." (Appendix B, '980 Patent). However, it appears that the parties only dispute the meaning of the term "easily." (Appendix D, Joint Claim Construction Statement).

60.   The dictionary defines "easily" as "In an easy manner; with ease." (Appendix L, The American Heritage Dictionary of the English Language (Fourth Edition, 2000), p. 562). The dictionary defines "ease" as "Freedom from difficulty, hardship or effort." (Appendix L, The American Heritage Dictionary of the English Language (Fourth Edition, 2000), p. 562).

61.   The Merriam-Webster's Tenth Collegiate Dictionary defines "easily" as "1: in an easy manner : without difficulty." (Appendix K, p. 363).

62.   In my opinion, these definitions do not provide a better understanding than the term itself.

63.   From my review of the '980 patent and prosecution history file (Appendices B, C), the ordinary meaning of the term "easily" is used in the '980 patent.

64.   Should it be determined that "easily" does require defining, I interpret "easily" as "without difficulty."

65.   To the best of my knowledge, the foregoing is true and accurate.  It is my understanding that discovery in this matter has not been completed.  I, therefore, reserve the right to supplement this Declaration as additional information becomes available.


Executed this _27th_ day of July 2010 at Amite, Louisiana.


_____
Dr. Richard L. Parish

13